UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:23-CV-00557-FDW-DCK

| | |
|---|---|
| ANDREW HUX<br>THREE REASONS, LLC , | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )  **ORDER**<br>) |
| MANAL SAFFOURY SCHATTIN<br>JAB-C, LLC<br>THIRTYONE THIRTEEN LLC , | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss, (Doc. No. 28), Defendants' Motion for Joinder, (Doc. No. 32), and Plaintiffs' Motion to Dismiss Defendants' Counterclaim, (Doc. No. 36). Movants have requested a hearing on all three pending Motions. (Doc. Nos. 37, 39, 45.) These motions have been fully briefed and are ripe for resolution. After reviewing the Parties' arguments, exhibits to their pleadings, and applicable law, for the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss, (Doc. No. 28); GRANTS IN PART and DENIES IN PART Plaintiffs' Motion to Dismiss Defendants' Counterclaim, (Doc. No. 36); and DENIES Defendants' Motion for Joinder, (Doc. No. 45). In large part, the Parties' arguments are more appropriate for summary judgment; therefore, this Order is without prejudice to the Parties' ability to reassert any applicable arguments at that stage of the case.

**I. BACKGROUND**

Plaintiff Andrew Hux and Three Reasons, LLC assert ten claims against Defendant Manal Schattin, JAB-C, LLC, and ThirtyOne Thirteen LLC arising out of Plaintiff Three Reasons, LLC's

1

purchase of a ready-mix concrete business from Defendants. (See Doc. No. 24.) Hux is the sole member of Three Reasons. Schattin is the manager of JAB-C and owns ninety-nine percent of the company. Her son owns the remaining one percent. Schattin and two of her sons were the members of ThirtyOne and Schattin was the manager of ThirtyOne at the time of the events giving rise to this action. (Id., p. 3.)

The parties engaged in an arms-length transaction for the sale of JAB-C's concrete business, Supreme Ready-Mix, including the cement trucks owned by associated entity ThirtyOne. Hux retained a broker to assist him in the sale. (Id., p. 5.) After several months of due diligence and negotiation, the parties reached an agreement and signed the APA on January 6, 2023, for a total purchase price of $2.4 million. (Id., pp. 5–11.) To finance the deal, Plaintiff secured a $1.988 million loan from Celtic Bank backed by the Small Business Administration. Hux and his wife, Amy Marie Hux, mortgaged their home to afford the loan. To finance the rest of the transaction, the parties also executed a Promissory Note of $240,000 to be paid to Defendants. (Id., p. 12.) Celtic Bank, Three Reasons, and JAB-C signed a Subordination Agreement subordinating the debt under the Promissory Note to Celtic Bank's "superior indebtedness." (Doc. No. 36-3.) Hux and his wife signed a Personal Guaranty of the Promissory Note. (Doc. No. 31-1 pp. 70–82.) Celtic Bank is not a party to the Promissory Note, and the Personal Guaranty does not reference the Subordination Agreement or Celtic Bank.

Plaintiffs' claims arise primarily from two sets of allegations: (1) Sellers' alleged material misrepresentations and omissions concerning the business's profit margins and operating costs during the due diligence period; and (2) Sellers' alleged breach of obligations to supply certain records under the APA and breach of their representations and warranties concerning the business. (See Doc. No. 24, pp. 13–33.) Specifically, upon taking possession of the business and the assets,

Hux discovered concerns. First, the business's profits were allegedly not consistent with Schattin's representations or the information available to Hux during the due diligence period. Second, Hux allegedly could not access all the business's records as required under the APA. Upon inquiry, Schattin informed him there were additional records available in another online platform, but she refused to give him access to the program. Schattin also represented she had deleted all her emails.[1] Further, Hux discovered the cement trucks he purchased from ThirtyOne as part of the agreement were all non-compliant with annual safety inspection regulations. Plaintiffs allege these issues resulted in the business becoming unprofitable, and Hux ultimately wound up the business. (Id., pp. 33–34.) Three Reasons and Hux defaulted on the Celtic Bank loan, and Defendants allege in their counterclaims that Three Reasons and Hux have also defaulted on the Promissory Note.

On August 30, 2023, Plaintiffs filed their Complaint. (Doc. No. 1.) On November 20, 2023, Plaintiffs filed their fifty-six-page, 417-paragraph Amended Complaint[2], asserting the following ten causes of action: (1) fraud/fraudulent inducement against all defendants; (2) breach of contract against all defendants; (3) unjust enrichment against all defendants; (4) negligent misrepresentation against all defendants; (5) unfair and deceptive trade practices against all defendants; (6) piercing the corporate veil against Schattin; (7) negligent infliction of emotional distress against JAB-C, LLC and Schattin; (8) intentional infliction of emotional distress against JAB-C, LLC and Schattin; (9) rescission against all defendants; and (10) punitive damages against all defendants. (Doc. No. 28.) Defendants' Answer to Plaintiffs' Amended Complaint included a counterclaim against Hux and Amy Marie Hux for breach of contract based on failure to make

---

[1] Plaintiffs' Complaint includes allegations of spoliation. The Court need not dispose of those allegations in ruling on the pending Motions to Dismiss.
[2] On February 21, 2024, Plaintiffs filed a Motion for Leave to file a Second Amended Complaint. (Doc. No. 48.) Plaintiffs later withdrew that Motion. (Doc. No. 56.) Plaintiffs' Amended Complaint, (Doc. No. 28), therefore, is the operative Complaint.

3

payments on the $240,000 Promissory Note, which is subject to the Personal Guaranty, and breach of the APA. (Doc. No. 31, pp. 60–62.) Relatedly, Defendants move to join Amy Marie Hux as a Counterclaim-Defendant. (Doc. No. 32.)

Defendants move to dismiss all but two of Plaintiffs' claims—breach of contract against JAB-C and piercing the corporate veil against Schattin, the sole member of JAB-C. (Doc. No. 28.) Plaintiffs move to dismiss Defendants' counterclaim. (Doc. No. 36.) The Parties' request hearings on the pending motions to dismiss and motion for joinder. (Doc. Nos. 37, 39, 45.) Having carefully reviewed the record, the Court finds is a sufficient basis in the briefs for this Court to rule and DENIES the Parties' requests for hearings. The Court will first narrow the claims subject to dispute in Defendants' Motion. The Parties agree Counts Six, Seven, and Eight of Plaintiffs' Amended Complaint are not directed at ThirtyOne. Insofar as the record is unclear on that point, the Court DISMISSES Counts Six, Seven, and Eight of Plaintiffs' Amended Complaint as against ThirtyOne.

## II. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a motion may be dismissed for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) inquiry is limited to determining if the pleader's allegations constitute "a short and plain statement of the claim showing the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). To survive a 12(b)(6) motion to dismiss, Plaintiff's "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Facial plausibility exists only when the factual content allows a court to draw the "reasonable inference" that the defendant is liable for the misconduct. Iqbal 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). The Court must draw all reasonable

4

factual inferences in favor of the party asserting the claim. Priority Auto Grp., Inc. v. Ford Motor Co., 757 F.3d 137, 139 (4th Cir. 2014).

In a Rule 12(b)(6) analysis, the Court must separate facts from legal conclusions, as mere conclusions are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678. Importantly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. However, well-pled factual allegations are entitled to a presumption of truth, and the court should determine whether the allegations plausibly give rise to an entitlement to relief. Id. at 679.

### III. DISCUSSION

**A.     Contract Claims**

Defendants move to dismiss Plaintiffs' breach of contract claims against ThirtyOne and Schattin. Further, Defendants move to dismiss Plaintiffs' unjust enrichment and rescission claims. For the following reasons, the Court will dismiss Plaintiffs' breach of contract claim against ThirtyOne only and Plaintiffs' rescission and unjust enrichment claims in their entirety.

    1.     *Breach of Contract*

Schattin signed the APA on behalf of ThirtyOne explicitly "as to Section 1.1(o)." (Doc. No. 25-2, p. 29.) In that Section, the Parties agree:

> Seller shall sell, assign, transfer and deliver to Buyer and Buyer shall purchase from Seller all right, title and interest in and to the assets of [Supreme Ready-Mix] . . . free and clear of any liens, claims or encumbrances of any nature whatsoever. At the time of Closing . . . such Assets shall include, but shall not be limited to the following: All vehicles appearing on Schedule 1.1(o) which are owned by Seller's affiliate, ThirtyOne Thirteen, LLC who shall sell the vehicles listed on said schedule included in the Purchase Price herein.

(Id., pp. 3–4.) The Parties do not appear to dispute that ThirtyOne did "sell the vehicles listed" on Schedule 1.1(o). Instead, Plaintiffs' claims rely on alleged defects in the trucks' inspection record.

5

(Doc. No. 24, p. 28–33.) But that claim relies on a representation in Section 5.10 of the APA, which did not bind ThirtyOne. ThirtyOne signed the APA explicitly "as to Section 1.1(o)." (Doc. No. 25, p. 29.) Plaintiffs' repeated allegations that the entire deal was "contingent on the transfer of the trucks," (Doc. No. 24, p. 28; Doc. No. 33, p. 6), cannot retroactively make Defendant ThirtyOne party to portions of the APA to which they were not a party. And Plaintiffs cite no law to support this theory of liability. The Court DISMISSES Plaintiffs' breach of contract claim as against ThirtyOne.

With respect to Schattin, upon the Court's review of the record, there is a dispute of fact as to whether Schattin signed the APA only in her individual capacity. Therefore, dismissal is inappropriate at this stage of the proceedings. An agent is not "individually bound when contracting within the scope of his employment[.]" Howell v. Smith, 134 S.E.2d 381, 384 (N.C. 1964) (citation omitted). As a result, "where individual responsibility is demanded, the nearly universal practice in the commercial world is that the corporate officer signs twice, once as an officer and again as an individual." Keels v. Turner, 262 S.E.2d 845, 847 (N.C. Ct. App. 1980) (citation omitted), disc. review denied, 269 S.E.2d 624 (N.C. 1980). Thus, while "a party [who] signs . . . twice, once in a representative capacity and once in a personal capacity, . . . is personally liable on [a] contract[,]" Telerent Leasing Corp. v. Boaziz, 686 S.E.2d 520, 522 (N.C. Ct. App. 2009) (citation omitted), a party who only signs once in a representative capacity is not, RD & J Props. v. Lauralea–Dilton Enters., 600 S.E.2d 492, 497 (N.C. Ct. App. 2004). Schattin signed the APA twice, and her individual signature is not limited to any particular portion of the APA, unlike ThirtyOne. (Doc. No. 25, p. 9.) For these reasons, Plaintiffs' contract claim against Schattin survives dismissal.

6

2. *Unjust Enrichment*

Defendants argue Plaintiffs' unjust enrichment claim is improper because "when a written contract exists, an unjust enrichment claim must be dismissed." (Doc. No. 28-1, p. 17.) The case Defendants cite, TSC Research, LLC v. Bayer Chemicals Corp., does not squarely support their proposition. 552 F. Supp. 2d 534 (M.D.N.C. 2008). To the contrary, in that case a district court within this Circuit explained pleading in the alternative is permissible under Federal Rule of Civil Procedure 8(e)(2) and defendants in that case "expressly ignore[d] the nature of alternative pleadings," allowing the plaintiff's unjust enrichment claim to proceed to discovery. Id. at 541. In TSC Research, the defendants argued a contract was never formed. 552 F. Supp. 2d at 539. Here, while Plaintiffs explicitly plead unjust enrichment in the alternative, (Doc. No. 24, p. 43), the parties agree the APA is an enforceable contract. (Doc. No. 24, p. 40; Doc. No. 27, p. 39.) For this reason, dismissal is appropriate. See also Bigelow Corp. v. Hounds Town USA, LLC, No. 3:23-cv-00134-FDW-SCR, 2023 WL 4939386, at *10–11 (W.D.N.C. Aug. 2, 2023) (declining to "imply a contract" where a written agreement exists).

3. *Rescission*

Defendants' motion to dismiss also challenges Plaintiffs' claim seeking rescission of the APA. North Carolina courts treat rescission as a remedy, not an independent claim for relief. See Trail Creek Investments LLC v. Warren Oil Holding, 2023 NCBC 36A ¶¶ 97–99 (N.C. Super. Ct. May 24, 2023). For this reason, dismissal of Plaintiffs' stand-alone rescission claim is appropriate. Rescission, however, is a possible remedy where an agreement was induced by fraud or mistake. See Green v. Condra, 2009 NCBC 21 ¶ 103 (N.C. Super. Ct. Aug. 14, 2009). For the reasons set forth below, the Court declines to rule on whether rescission is an available remedy in this case at the pleadings stage. Defendants call the Court's attention to Childress v. C. W. Myers Trading

7

Post, Inc., but that case does not change the Court's view. 100 S.E.2d 391 (N.C. 1957). There, the North Carolina Supreme Court explained rescission is an appropriate remedy only where the breach is "so material as in effect to defeat the very terms of the contract" and reversed the lower court's decision not to send that issue to the jury. Id. at 156–57. That decision supports the Court's conclusion the question of rescission as a remedy—but not a separate claim—should proceed past the pleadings stage.

**B.     The Economic Loss Rule**

Defendant argues the economic loss rule bars Plaintiffs' negligence claims. The Court agrees. "Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." N.C. State Ports Auth. v. A. Fry Roofing Co., 294 N.C. 73, 81 (N.C. 1978). In an action for negligence, North Carolina has traditional followed "the majority rule and does not allow the recovery of purely economic losses." AT&T Corp. v. Med. Review, Inc., 876 F. Supp. 91, 93 (E.D.N.C. 1995) (citing Chicopee, Inc. v. Sims Metal Works, Inc., 391 S.E.2d 211, 217 (1990)). The Fourth Circuit summarized the North Carolina economic loss rule in Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158 (4th Cir. 2018):

> A "tort action must be grounded on a violation of a duty imposed by operation of law," not a violation of a duty arising purely from "the contractual relationship of the parties." Rountree v. Chowan Cty., 796 S.E.2d 827, 831 (N.C. Ct. App. 2017) (citation and internal quotation marks omitted). Thus, a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." Id. at 830 (citation omitted). "It is the law of contract," not tort law, "which defines the obligations and remedies of the parties in such a situation." Id. (citation omitted). Accordingly, "North Carolina law requires" courts "to limit plaintiffs' tort claims to only those claims which are 'identifiable' and distinct from the primary breach of contract claim." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998) (quoting Newton v. Standard Fire Ins. Co., 229 S.E.2d 297, 301 (N.C. 1976)).

Here, Defendants' obligations to Plaintiffs arise out of the parties' arms-length business transaction. The allegations of Plaintiffs' breach of contract claims are substantially similar to their

8

negligent misrepresentation claim, such that Plaintiffs' negligence claim is not distinct from their primary breach of contract claim. (See Doc. No. 24, pp. 40–41, 45–46.) Plaintiffs argue their negligent infliction of emotional distress claim seeks to compensate harm to something "other than the subject of the contract." (Doc. No. 33, p. 12.) However, the harms Plaintiffs identify—taking out personal loans, personal financial trouble, and stress caused by that personal financial trouble—all stem from the transaction between Plaintiffs and Defendants. Accordingly, the economic loss rule bars those claims.

**C.      Fraud and Unfair and Deceptive Trade Practices**

Defendants move to dismiss Plaintiffs' fraud claims under Federal Rule of Civil Procedure 9(b) and Oberlin Capital, L.P. v. Slavin, 554 S.E.2d 840 (N.C. Ct. App. 2001). While there is no "precise formula" or "any certain language" that must be used to plead a claim of fraud, Carver v. Roberts, 337 S.E.2d 126, 128 (N.C. Ct. App. 1985), a complaint must allege facts that, if proven, would support a claim for fraud "upon a liberal construction of the whole pleading," Piles v. Allstate Ins. Co., 653 S.E.2d 181, 186 (N.C. Ct. App. 2007) (quoting Carver, 337 S.E.2d at 128). Nevertheless, Rule 9(b)'s particularity requirements do not release a plaintiff from its burden to plead facts that, if accepted as true, "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see Iqbal, 556 U.S. at 684 (holding plausibility requirement applies to all civil actions). As such, to satisfy the particularity requirement for a fraud claim, the complaint must "at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 455–56 (4th Cir. 2013) (quoting United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)). Plaintiffs allege Schattin selectively disclosed purchase orders on October 21, 2022, and made inaccurate

9

representations of the supplier's price increases also in October 2022. (Doc. No. 24, pp. 5–8.) Further, Plaintiffs allege "during the purchase negotiations"—a period of only a few months—Defendants provided incomplete and inaccurate profit and loss statements for the business. (Id., p. 5, 17.) The Court concludes these allegations sufficiently plead fraud under Rule 9(b). The same allegations support Plaintiffs' Unfair and Deceptive Trade Practices Act claim, and for the same reasons that claim is adequately pled under Rule 9(b).

In Oberlin, the Court dismissed plaintiff's claims against defendant's director—who had been actively involved in the underlying transaction, aware of defendant's breach and its material nature, and failed to disclose that information—because plaintiff could have discovered the true facts "upon reasonably adequate inquiry." 554 S.E.2d at 845, 846. Here, Plaintiffs allege Hux did ask Schattin about the business's profits and supplier price increases. (Doc. No. 24, p. 6.) Hux alleges he could not have discovered these misrepresentations with "reasonable due diligence" because of Schattin's false answers and Defendants' alleged failure to produce complete business records. (Id.) Further, Plaintiffs allege Hux could not verify Schattin's claims because they were provided incomplete, inaccurate profit and loss statements. (Id.) Defendants partially admit many of Plaintiffs' allegations concerning conversations between Hux and Schattin. (Doc. No. 31, pp. 9–11.) On this record, the Court determines disputes of fact exist as to Plaintiffs' fraudulent inducement claim. See, e.g., Cummings v. Carroll, 866 S.E.2d 675, 693–94 (N.C. Ct. App. 2021) (refusing to dismiss fraud claim where genuine disputes of material fact existed as to whether plaintiffs reasonably relied on misrepresentations).

**D.     Remaining Claims**

Defendants argue the Court must dismiss Plaintiffs' remaining claims because they require "heightened misconduct." (Doc. No. 28-1, p. 16–17.) The Court concludes, taking Plaintiffs' well-

10

Case 3:23-cv-00557-FDW-DCK     Document 75     Filed 09/04/24     Page 10 of 17

pleaded allegations as true—as it must at this stage of the proceedings—disputes of fact preclude dismissal. The Court acknowledges the parties recently filed cross-motions for summary judgment, (Doc. Nos. 66, 68), and will evaluate Plaintiffs' remaining claims with the benefit of the full summary judgment record.

**E.      Defendants' Counterclaims**

Defendants filed a counterclaim for "breach of contracts" against based on Three Reasons': (1) failure to pay all monies owed under the Promissory Note; (2) and failure to allow Defendants to exercise their security interest in the collateral securing the Note; and (3) refusal to compensate Sellers for the costs of collecting certain documents and data, which they allege is required under the APA. Defendants further allege the Huxes are liable for all monies owed under the Promissory Note because they executed a Personal Gauranty. (Doc. No. 31, pp. 54–62.) Plaintiffs move to dismiss the counterclaim in its entirety for failure to join a necessary party—Celtic Bank—and failure to state a claim. (Doc. No. 36.)

1.      *Alleged Breach of the APA*

The Court will begin with Defendants' counterclaim as to Plaintiffs' alleged breach of the APA by failing to pay Defendants the costs of producing certain records. A portion of Plaintiffs' own breach of contract claim also includes the APA provisions related to production of business records, and at least a portion of that claim is not subject to Defendants' motion to dismiss. Further, the Court has denied Defendants' motion to dismiss that claim as against Schattin. For that reason, dismissal of the portion of Defendants' counterclaim relying on alleged breach of the APA is inappropriate at this stage of the proceedings.

11

2.  *Failure to Join Celtic Bank*

Plaintiffs assert that their financier, Celtic Bank, is an indispensable party that cannot be joined because it is not subject to service of process within 100 miles of this District and may not be subject to personal jurisdiction here, therefore Defendants' counterclaim under the Promissory Note and Personal Guaranty must be dismissed. (Doc. Nos. 36, 36-1.) In response, Defendants argue they seek only to establish the existence of a debt, and that because Celtic Bank is not a party to the Promissory Note or the Personal Guaranty it is not a necessary party. (Doc. No. 40.)

A party may move to dismiss based on failure to join a necessary party under Federal Rule of Civil Procedure 12(b)(7). Then, the Court must conduct a three-part inquiry: (1) whether the non-joined party is necessary under Rule 19(a); (2) whether the joinder is feasible; and (3) if it is not, whether dismissal is appropriate "in equity and good conscience" under Rule 19(b). Fed. R. Civ. P. 19(a)-(b); see also Gunvor SA v. Kayablian, 948 F.3d 214, 218–19 (4th Cir. 2020). For the following reasons, the Court concludes Celtic Bank is a necessary and indispensable party to the portion of Defendants' counterclaim seeking to enforce the Personal Guaranty that the Huxes will pay Three Reasons' debts under the Promissory Note, and joinder is not feasible.

A non-joined party is necessary if:

> (A) [I]n that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). A party might be necessary under either subsection (A) or (B). Gunvor, 948 F.3d at 220. Here, the Court looks to the whether Celtic Bank "claims an interest relating to the subject" of the Counterclaim such that its absence "may as a practical matter impede [its] ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). Celtic Bank has an interest in Three

Reasons' repayment of its debts under the Loan Agreement, (Doc. No. 36-5, p. 2-8), which facilitated the purchase of Supreme Ready-Mix. Celtic Bank has—albeit cryptically—indicated to Defendants' counsel its intent to defend its "Superior Indebtedness" under the Loan Agreement and Subordination Agreement, satisfying Rule 19(a)(1)(B)'s first requirement.[3] (Doc. No. 36-4, p. 2.)

Further, the Court concludes Celtic Bank's superior interest may be practically and legally impaired by the resolution of Defendants' counterclaim. Defendants argue that is not the case because they seek only judgment concerning "the **existence** of a debt" and their claim should not be dismissed "merely because collection rights may be subordinated." (Doc. No. 40, p. 4) (emphasis in original). That argument is contradicted by Defendants' pleadings, which seek judgment "in an amount to be determined by the Court"—not, for example, a declaratory judgment as to the existence of the debt—and access to the collateral under the Personal Guaranty. (Doc. No. 31, p. 62.) It is not clear from the record before the Court whether Defendants' interest in that collateral overlaps with Celtic Bank's superior interest. Further, Defendants seek to enforce the Promissory Note against Hux, its personal guarantor, who is also the sole member of Three Reasons, the debtor under the Loan Agreement with Celtic Bank. Three Reasons has ceased operating Supreme Read-Mix and defaulted on the Loan Agreement. As a practical matter, Defendants and Celtic Bank seek to recover debt from the same pool of money and assets—Hux's assets.

Further, to resolve Defendants' Counterclaim, the record suggests there is a dispute of fact regarding the Subordination Agreement the Court would have to resolve first. Defendants posit that the Subordination Agreement does not apply to the Personal Guaranty, therefore they can

---

[3] The Court notes that even where a party has not formally claimed an interest, the Court may consider *sua sponte* the absence of a required party. Republic of Philippines v. Pimentel, 553 U.S. 851, 861 (2008).

recover without complying with its terms and without the presence of Celtic Bank. (Doc. No. 40, p. 7.) But Schattin, who seeks to enforce the Personal Guaranty, appears to have signed the Subordination Agreement twice. (Doc. No. 36-3, p. 4.) See Telerent, 686 S.E.2d at 522 ("A party [who] signs . . . twice, once in a representative capacity and once in a personal capacity, . . . is personally liable on [a] contract.") The Personal Guaranty does not include an integration clause and appears to have been executed at the same time as the Promissory Note, Loan Agreement, and Subordination Agreement. (Doc. No. 31-1, pp. 70-92; Doc. Nos. 36-3, 36-5.) Upon review of the record, the Court concludes there are disputes of fact as to whether, as Defendant argues, the Personal Guaranty stands alone, rather than as one piece of a multi-part financing scheme to facilitate the sale of Supreme Ready-Mix to Three Reasons.

If the Court were to interpret the Subordination Agreement with giving Celtic Bank—a party to that Agreement—an opportunity to be heard, that may impair its legal interests. Perhaps the Personal Guaranty is subject to the Subordination Agreement; perhaps not. If it is, allowing Defendants to secure a judgment against the Huxes *without* complying with the terms of the Subordination Agreement would frustrate the purpose of the Agreement, an instrument to which Celtic Bank is a party and that protects its position as superior creditor. Defendants cite out-of-circuit law to support their argument that subordination does not bar their counterclaim. See Standard Brands v. Straile, 260 N.Y.S.2d 913 (App. Div. 1965) (holding an inferior creditor could pursue an action against the personal guarantor of its inferior indebtedness where the guaranty was free from ambiguity); Charles W. & Ruby W. Norton, Inc. v. Leadville Corp., 570 F.2d 911 (10th Cir. 1978) (holding personal guarantees were not unenforceable but judgment must be limited to require notice to a superior creditor before execution). However, neither case addresses the

14

relevant factors under Federal Rules of Civil Procedure 12(b)(7) or 19. Defendants only cursorily address Rule 12(b)(7), dedicating two sentences to distinguish the cases on which Plaintiffs rely.

Because the Court concludes Celtic Bank is a necessary party to resolution of Defendants' Counterclaim as to the Promissory Note and Personal Guaranty, the Court must consider whether joinder is feasible. Fed. R. Civ. P. 19(b). Plaintiffs argue Celtic Bank is not subject to personal jurisdiction in this District and is not subject to service under Fed. R. Civ. P. 4(k). Further, the Subordination Agreement includes a choice of venue provision selecting the courts of Salt Lake City, Utah. (Doc. No. 36-3, p. 3.) Because Celtic Bank cannot be served—a point Defendants do not appear to contest—the Court must determine whether dismissal is appropriate.

The Federal Rules of Civil Procedure direct the Court to consider four factors in determining whether dismissal is appropriate where a necessary party cannot be joined. The first factor concerns "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties." Id. This "speaks to many of the same concerns addressed by the necessity analysis under Rule 19(a)(1)(B)." Home Buyers Warranty Corp. v. Hanna, 750 F.3d 427, 435 (4th Cir. 2014) (cleaned up). For the reasons discussed above, judgment on Defendants' counterclaim rendered in Celtic Bank's absence would prejudice Celtic Bank. This factor favors dismissal.

The second factor addresses "the extent to which any prejudice could be lessened or avoided by" "protective provisions in the judgment." Fed. R. Civ. P. 19(b)(2). On this point, Defendants argument is persuasive as to collection rights. If Defendants succeed, the Court could issue judgment in their favor but stay execution of that judgment until Celtic Bank's superior interest was resolved. See, e.g., Norton, 570 F.2d at 913. However, the Court has already concluded

15

that in order to reach that resolution it would have to interpret the Subordination Agreement, and doing so without Celtic Bank would prejudice its interests. This factor favors dismissal.

The third factor asks "whether judgment rendered in the person's absence would be adequate." Fed. R. Civ. P. 19(b). This factor "focuses on the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." Home Buyers, 750 F.3d at 436. Judgment in this case would provide Defendants with an adequate judgment as to the Counterclaims. The Court notes, however, it may be more efficient to resolve the issues of fraud and breach of contract in the underlying business dispute before addressing claims related to financing. This factor is neutral.

The fourth factor looks to "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4). Here, Defendants-Counterclaim-Plaintiffs could seek relief in a federal court in which all parties are subject to jurisdiction. In sum, three factors weigh in favor of dismissal. One factor is neutral. The Court finds dismissal of Defendant's Counterclaim insofar as it seeks a judgment regarding Plaintiffs' debt under the Personal Guaranty is appropriate.

2. *Joinder of Amy Marie Hux*

Defendants move to join Amy Marie Hux, Hux's wife, as a Counterclaim-Defendant to this action under Federal Rule of Civil Procedure 20. (Doc. No. 32.) Because the Court dismissed Defendants' counterclaim insofar as it seeks to recover from Amy Marie Hux under the Personal Guaranty, the Court DENIES Defendants' Motion for Joinder.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss, (Doc. No. 28), is GRANTED IN PART and DENIED IN PART, Plaintiffs' Motion to Dismiss Defendants'

Counterclaim, (Doc. No. 36), is GRANTED IN PART and DENIED IN PART, and Defendants' Motion for Joinder, (Doc. No. 32), is DENIED.

**IT IS FURTHER ORDERED** that the Parties' Motions for Hearing, (Doc. Nos. 37, 39, 45), are DENIED as MOOT.

**IT IS SO ORDERED.**

Signed: September 4, 2024

Frank D. Whitney
United States District Judge